May it please the Court, Mark Crum on behalf of Plaintiff Appellate Michael Citrick. I'd like to reserve five minutes, please. This appeal does not raise any difficult or nuanced issues of law. In fact, the issues of law are quite familiar. Rule 56 disposition, Rule 56F in particular is germane here. The law concerning the resolution of issues of materiality, reliance and statute of limitations by the judge, not the jury. What's extraordinary about this case is the haste with which the district court disposed of it. The district court order disposing this case is fairly understood to be a disposition pursuant to Rule 56 because it considered factual matters beyond the pleading and indeed it considered factual matters that are nowhere in the record. The district court did this only approximately four months after the case had been removed from state court. It did it at the inception of the case before there was any discovery indeed, before there had even been Rule 26 disclosures. And the district court did so without addressing the plaintiff's request under Rule 56F. The district court was not incorrect in all respects by any means. For example, the following observation by the district court found at page 367 of the record is right on the mark. The district court said, this is not a run-of-the-mill case of poor financial performance. The plaintiff lost his entire investment, $4 million, within an extremely abbreviated amount of time. There was another aspect. Could I ask you to address the question I'm particularly interested in? The district court said that the alleged, in essence, the alleged omissions, the two omissions, were immaterial as a matter of law. Why was that wrong in looking at the cases like In Re Convergent Technology, which suggests that there's really no obligation to provide detailed internal analyses, which seems to be what the omissions were alleging, seem to support what the district court ruled? Certainly, I'm pleased to speak to that. And I'm going to start with a little law, just by way of context. First, only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ, are those issues appropriately resolved as a matter of law? And that's what this court said in syntax. The other law that is particularly germane to the question you posed has to do with generalized disclaimers. I would refer the court to the Trump case from the Third Circuit. Generalized disclaimers that investors could lose their investment are ineffective. I would refer the court to the Miller v. Pisani case, which we know is worlds of wonder in this circuit. Blanket warnings that securities involve a high degree of risk are insufficient. And probably most notably and most to the point, I think, is the Supreme Court opinion in Virginia bank shares. Now, that case involved a different set of facts that had to do with, well, anyway, here's what the court said. The cautionary statement must, quote, discredit the other one so obviously that the risk of deception drops to nil, close quote. And the court also said, not every mixture with the true will neutralize the deceptive. But counsel, aren't you handicapped in arguing those cases by the fact that you're not relying on statements that were false or misleading? Your contention is that they didn't go far enough, that there were other areas, and I think Judge Ikuda has identified them, other specific areas that should have been disclosed. And the trial court said that's nonsense. And that's correct, Your Honor, with the following caveat. In the presentation, for example, and this is in the record at page 39 and again at the record at page 62, the document depicts a return rate, projected return rate. I'll read it from page 62. Based on the assumption detailed below and on pages 44 and 45, the table below depicts equity note returns as a function of annual default rate and weighted average coupon. What document are you reading from? That is the presentation, which is the first of the series of offering documents, Your Honor. Now, that's the one that the judge found was not an offering document because it said it wasn't, because the later documents seem to be describing a somewhat different offering in a larger amount and with different tranches. That's the factual determination he made. That's correct. It is a factual determination and therefore improper. And second, it is mistaken. As we explained in our briefs, they were, in fact, the same transactions, and the difference is how they got divided into sub-tranches. Those were a different amount, too, was it not? Well, but, Your Honor, that doesn't change the nature of the investment. It just leads credence to the notion that this was not the document that was created for this offering and said it wasn't. Well, Your Honor, that's, as I've observed, is a disputed factual issue. Why is that a disputed fact? I mean, the document says on it that it's not an offering. You can compare. The second one says that you should only rely on this one. You look at the two pieces of things and you can see just facially that they're for different amounts and with different terms. Why isn't that the end of the story? That's not the law, and that's a recipe for fraud, and let me explain that, Your Honor. First, let me observe what the district court also said. The district court acknowledged that the presentation was created and used to procure investors. At page 315 of the record, the opinion, it says, in connection with the CBO2 offering, the defendant appellees created and disseminated several documents, including the presentation, for the purpose of procuring investors. And let me stop and belabor the obvious for a minute. That document is not a meaningless document, and it was used for exactly that purpose, and indeed, that's what the evidence here showed happened. Mr. Citrick's declaration testified that he went through the presentation with the investment advisor that presented the offering to him, that he spent his money to purchase before actually receiving the other documents. The reason that language, by the way, the reason that language is included has nothing to do with it not being a legally operative document for the purposes of a fraud claim or a claim under the 1934 Exchange Act for securities fraud. Under Rule 501 in Reg D, which we cite at something like page 22 or 23 of our reply brief, we point out that what that disclaimer does is that it is part of ensuring that the whole process does not either violate state blue sky laws or, second, require that the offering be a registered offering under the 33 Act. And that's what, that's all that does. And in fact, Preliminary Note 1 to Rule 501, bear with me so I can find it in my notes here. Could you, after you've read it, found it in your notes, can you bring that back to why the existence of this presentation piece makes those two omissions material? I will, Your Honor. In fact, those are omitted, by the way, from all the documents. Here's the answer in 501. Thank you for your patience. The district court quoted that, as you observed, and he also observed that they created it for the purpose of procuring investors. Preliminary Note 1 to Regulation D provides that securities sold or offered for sale pursuant to that exemption, that's what this is, an exemption, are not exempt, not exempt from the anti-fraud provisions of the 1934 Exchange Act. The point of that note is to confine the effect of the exclusion, it's a safe harbor is what it is, to simply saying this is not a violation of the 33 Act that would otherwise require this offering to be registered and it's not a violation of California blue sky laws. Now, the practical point of holding that because the document says that, no one can reasonably rely on it, is that it immunizes every offeror of this kind of offering and they invariably begin with a sales document such as the presentation. It cultivates the interest of the investor. And they typically follow with an offering memorandum or a placement memorandum that literally is delivered on the day of closing. And there are plenty of cases that talk about what difference does it make if the investor read or didn't read the final documents. And the answer is, in this case, to answer your Honor's question, it makes no difference. And the reason for that is that not one of these documents disclosed the risk. And the two risks are that a loss of value of as little as 20% in the underlying portfolio would wipe out the notes. These are very specific items that are being indicated as being the material omissions. And you can well see how if those were included, you could pick out two others that were also not included. And in cases like convergent technology seem to say, well, you don't have to include everything that the company may have thought of. Why is it that these two specific omissions are material, are different than two other things you might have picked out as not being there? One at a time. The first omission, the one I just described, I don't have to decide it's material. The defendant appellees did. At page 46, excuse me, it's page 62 of the record, they have a table that depicts the returns on these notes based upon default rates. I'm sorry, this goes to the second omission, that a recurrence of historical default rates with a specified period of time would wipe out the investment in the notes. Those internal numbers they ran, and that seemed to me to be similar to this convergent technology case where we said that the company there had run all of these numbers and had some information about effects and material information, it would seem. But the court said, no, you don't have to disclose everything. What you disclosed about the riskiness of this investment was enough. Why isn't this the same? Well, there are two answers to that, Your Honor. First of all, because the disclosures they made make the omission important. And what I'm saying is... Are the disclosures inaccurate? No, that's not the claim. The disclosures are misleading. I understand that, but I'm just asking, are the disclosures inaccurate? Well, except insofar as it says in the offering memorandum, we tell you what you need to know to invest. In that respect, it's inaccurate. But otherwise, no, that's not the claim, Your Honor. If they decided that it was important enough to sell these notes, to put in returns reflecting what happens at a different default rate, why did they stop at 6%? And the answer is because you won't sell this stuff if you actually run it out to 10% and show that you lose everything. Excuse me, you lose everything when it goes out to 10%. I didn't make this up. I didn't do the presentation. My client didn't do it. He got a document that showed these returns, the ones I'm describing to you, and they made an affirmative decision. I guarantee you that's what the discovery will show because I've done it in another case. They made an affirmative decision not to include that table any further out because you look at it, and you're going to see, oh, my God, while I won't make any money to speak of, somewhere between 2.5% and 10% will be my return at a default rate of 6%. At 10%, 9%, 10%, I'm literally going to lose all of my principal. So they can't have it both ways is the answer to the question. One thing I couldn't understand is, does this table purport to be covering the Class E bonds? Yes. Yes, Your Honor. The equity notes in the presentation are what became the Class E bonds. So that's exactly why I'm talking about it. Now, the other problem with this approach, and I wasn't being glib when I said it's a prescription for fraud, these documents are used, and there are plenty of cases where we've seen them, and the question is, did they read them? Did they read the subsequent documents? Same questions we have here. The rule that they don't matter immunizes people who use these kind of documents, which, as I explained, have that disclaimer. It's not an offer for sale and so forth. Look at the other documents because it has to have that disclaimer. It's going to violate the 33-X. Now, the other question that I want to emphasize, the other question I want to answer, and the point I want to emphasize is where I was going when I read from Trump and Virginia Bank shares in one other case. The judges have, district court judges have, right, there were disclosures you could lose all your money. There were disclosures it was risky. Those are everything and nothing disclosures. The Virginia Bank shares case and the Trump case make perfectly clear that the disclosures have to match up with the affirmative disclosures made. Only if the affirmative are otherwise misleading. Well, that's why I submit, Your Honor, it's a factual question. How could reasonable minds not differ that this chart is misleading when you see at 0% default rate, my return is going to be between 18.65 and 24.21 at 0% default rate? Well, isn't it, and maybe I've misread the record, and this is, of course, your opportunity to correct me if I have, but doesn't Mr. Citrick represent himself as a skilled, experienced investor? Doesn't the record represent him as one assisted by an independent financial consultant and a lawyer? I mean, now can you in good conscience tell the court that he didn't understand that if the failure rate exceeded what is set out in the table, that he's going to be worse off? Well, worse off isn't the question, Your Honor. That's my point. The question is how much worse off, and that was where I was literally going. If it goes from a 9.75 return to a 2.54 return, when it goes from 0% to 6% If you looked at the other chart, I think it showed the possibility of an 11% default rate. There's nowhere in any of these documents, Your Honor, does it tie the, no, I'm sorry. There's a chart that shows historical default rates. There's no disclosure whatsoever about the consequences of a recurrence of historical default rates. But anybody, I mean, I am not an investor. I don't do any of this. I know that you can't predict the future, and that if there had been 11% default rates in the past, there could be 11% default rates in the future. That's exactly right, Your Honor. And what they didn't do is tell you, as an investor in these notes, the consequences of a recurrence of those rates. Literally, Your Honor, if that three- or four-year period recurred. And if I had gotten that piece of paper you showed me, I'd say, well, there was an 11% default rate sometime in the future. They're only showing me default rates under 6%. I'd go in and say, well, what if there was a 7% default rate? There could be because we know there's been in the past. I mean, there's nothing in there that negates that possibility, that tells you anything false about that situation. Adam, if you want to reserve time, you're down to three minutes. Let me answer this question, and then I'll stop. To correct the record, no, Mr. Citrick's declaration said he didn't read these documents. They were prepared for him, and he signed them, or words to that effect. And second, the – I'm talking about the subscription agreement. That was what I understood the question to be about, the subscription agreement, where he's supposedly a sophisticated investor. That, too, is relevant only to the question of whether the offering needed to be registered under the 33 Act. It is irrelevant to the question of whether he's entitled to reasonably rely on the statements and the omissions in the offering documents. And, by the way, the reasonableness of the reliance, at the risk of belaboring the obvious, is a question typically reserved for the jury. Even when you have an independent financial advisor and independent lawyer look over things? Absolutely, Your Honor. And what I would say is these investment vehicles are so complicated that it requires someone with the skills of an investment banker and someone with the computer program, typically a proprietary computer program, to calculate exactly what they calculated and the kinds of things they depicted in the table I keep citing to you. And all they had to do was say, by the way, with respect to one other item, under what circumstances might you lose all your money? And if reasonable minds cannot differ as to whether it would be relevant to tell an investor about then-identified circumstances under which he or she could lose all of the money invested on a return, as you heard, which didn't promise anything spectacular, 2 to 18 percent, then I submit there isn't much that really is material. It's everything and nothing will suffice. And that, of course, is why I described it as a recipe for fraud. Last comment on that particular point, and I have a minute, I guess, is in the other case we have with the same able counsel, one of the professional experts is now a buyer. They thought it relevant. So it's not just my view, but that, of course, isn't the point. The point is, is it a question as to which reasonable minds could differ? Thank you. Thank you very much, counsel. Good afternoon. May it please the Court. I'm Michelle Frahn from Keesey, Young & Logan, and I'm here on behalf of Prudential Equity Group, and we thank you for your time and consideration in helping us resolve these matters. It is our position that Judge Wilson reviewed all of this documentation, unlike Mr. Citrick when he made his investment. And in reviewing that documentation, Judge Wilson properly affirmed that there were no material misrepresentations made to the investors in this CBO2 product. Let me direct you to one issue that is bothering me, and that is the question of whether it was appropriate in summary judgment to hold that Mr. Rosen was not Mr. Citrick's lawyer and therefore could not be an agent for purposes of reviewing or reliance. Judge Wilson did conclude that Mr. Rosen may not have been acting as his attorney. I believe that we come to the same conclusion that this case can be disposed of on a motion to dismiss and or summary judgment based upon Mr. Rosen acting as his attorney or not acting as his attorney. And in addressing that issue in particular, it goes to the issue of reliance that is necessary for the causes of action that Mr. Citrick has alleged. And if we take, for example, Mr. Rosen acting as Mr. Citrick's agent, Mr. Citrick has not provided the court with any case law that supports the position that Prudential Equity Group can be held liable for whatever Mr. Rosen did for Mr. Citrick. The cases that were presented by Mr. Citrick are instances where an agent is disclosed to, in this instance, Prudential Equity Group. And in the instance where the principal, Prudential, would have known that Mr. Rosen was acting as an agent, in this case we did not know that and it was never disclosed to us, or that Prudential acted in a manner wherein Prudential disseminated information to Mr. Rosen with the expectation that Mr. Rosen would have provided it to Mr. Citrick. Those are the cases that were suggested to provide Mr. Citrick with the shield. Essentially, your position is he can't have a self-designated agent that the defendant doesn't know about. Precisely. I would also submit that Mr. Rosen's reliance on the offering memoranda and private placement, as it is suggested in the documents, was not reasonable under any circumstances. And so, as a matter of law, the court could conclude that Mr. Citrick does not have reasonable reliance or justifiable reliance on what Mr. Rosen did. Your position really is that an investor has to, in order to claim reliance, has to read the documents himself, even if he's, for some reason, disabling, he can't speak English or he's elderly or whatever, and rather than designating someone else, some reasonable person to do that for him. In the instance that he does designate someone else, and there are cases, especially in connection with translation issues, that he has to rely on his agent. Right. And therefore, if the agent does, as Mr. Rosen did and said, There's just boilerplate not to worry, and there's a problem, then it's the agent's responsibility. Prudential did not prepare a 200-page offering memoranda for Mr. Rosen to tell Mr. Citrick, don't worry about it, it's mere boilerplate. Prudential prepared 200 pages of documents that are riddled with disclosures and disclaimers about this particular investment. But that's a different issue. That gets to the merits of the materiality. Let's suppose that there was a material. You have to assume for purposes of this question, this issue, that there was a material, let's say affirmative misstatement or misrepresentation in the documents, and that Mr. Rosen, in fact, relied on that statement in telling whatever he said to Mr. Citrick, both of which are counterfactual, I understand that. But still, your theory has to be that even if that were the case, your client could not be liable. Correct. First, we cannot be liable because what Mr. Citrick is suggesting that we put into our disclosure documents are forecasts, mere forecasts of what could happen. If this happens, then that might happen. And the case law is very straightforward on those issues. The convergent technologies, the in-way verifone, as well as the stack electronics, Ninth Circuit, that instructs us that forecasts cannot possibly be actionable. And that's exactly what they're requesting us to do, is to say, well, maybe if this happens or if the market goes down this amount, then that's going to happen. Brokerage firms, private placement agents don't put those things in there for two reasons. One, it's impossible to decide what scenarios could possibly occur with this portfolio. And second, it might give reassurances to investors that aren't possible. For example, if we say that history is going to repeat itself, as he suggests are in these documents, we may be telling them that the default rate for the next five years is going to be zero, and therefore you're going to make 11% or 19%. That would be equally as difficult for an investor to be able to rely upon as what they're suggesting that we say that the market's going to go down. The investors in these investments are held to know that the markets go up and the markets go down in either way will affect their investments. One other issue that's been troubling me is with regard to this presentation document that the judge district court found was not a relevant document. That's the one document he did read. Would your position be the same if there were affirmative misstatements in that document? And also, there's also the fact that there's some mismatch between the two offerings. But let's say the offerings were more matched than they are now, but it still said this is not an offering and so on. Are you just saying that that kind of a document simply cannot be relied upon? Well, under the circumstances that Mr. Citrick presents, absolutely. I say that you cannot rely on this presentation. The presentation, if we're going to look at what Mr. Citrick is saying should have been in this document, then we are protected by this document, by the Bespeaks Caution Doctrine, which we discuss in our papers and we appreciate does not directly apply to the actual offering documents, the offering memoranda, and the private placement memoranda. However, case law supports our position that if we do make forecasts, if we do give past historical data, that if we warn the investor that these are past historical representations or that they are in any way giving a suggestion of what may occur in this investment, if we give them cautionary language, the Bespeaks Caution information. I'm asking whether it's your position or what you're understanding of the district court's position that this presentation document, because on its face it's not an offering document, and even if it had an affirmative misstatement, not a projection, but just an affirmative misstatement about, for example, how the two classes of securities listed there related to each other in some way that was detrimental to the potential buyers of the second group. Is your position that it simply cannot be the basis for reliance in a fraud case of this kind? Yes, it is. Why isn't that a recipe for fraud? This document represents a suggestion of an investment that's going to be structured. This document in terms of its timing. But it's certainly meant to entice people into interest in the purchase. It certainly is. But it cannot possibly be relied upon as the offering memoranda and the private placement memoranda must be relied upon, because it's not describing, as counsel suggested, this is not describing the final CBO2 investment that was put together and provided to Mr. Citrick in September of 1999. It's a working document in July, June and July of 1999, that FMA was utilizing in order to determine whether or not there was sufficient investment interest in a product like this. Is there any case law under the relevant California statutes about something like this? With respect to a presentation? The information with respect to presentations, you know, I don't have anything handy. But what I would suggest is that it's very similar to the case law that discusses sales promotional materials. The Brown v. E.F. Hutton case where they talked about a presentation made by the investment advisor. In every one of those types of cases, in the cases where they say that there's an oral representation, would be similar to this presentation, in that in all of the lines of cases of oral representations, the courts tell the reasonable investors that they must look at the final offering documents. The Brown v. E.F. Hutton case, the Kennedy v. Joseph Thal and the 101 cases are very similar. It falls into the category of the Marlowe v. Gold case that the judge cited to in his opinion, in that when you have a reasonable investor, and in this instance our reasonable investor is an accredited investor who has made a representation to us, that he is knowledgeable in this type of an investment. He has done it before and indeed is willing to accept the risks in all of those circumstances. What case says that when we look at the reasonable investor, it's the reasonable investor in this particular circumstance, as opposed to just some general reasonable investor? That's very interesting because I was not able to find a case that talked about a reasonable investor in terms of a 501 offering. However, when we look at the different cases that talk about reasonable investors, many of them give the Brown v. E.F. Hutton case as a perfect example, as well as the Faulkner v. Beer case. They discuss the investor as, in some instances, unsophisticated investors. The Faulkner case, although it was reversed and remanded for different reasons, talks about the investors being unsophisticated, and despite that fact they are held to be reading the final perspectives. And so if a court can conclude as a matter of law that investors in the open marketplace, and in this instance it was supposed to be in the Brown v. E.F. Hutton case, a limited partnership that was supposed to give them income and safety and security, the court found that they were unsophisticated investors, yet required and held to read the prospectus, then one can conclude that if anyone is going to purchase CBO2, they must be an accredited investor. Then what we are dealing with here today is a pool of accredited investors because an unsophisticated investor, such as in the Brown case, would not be allowed to buy CBO2. And for that reason, I think as a matter of law, it is fair to say that these investors, because they had to comply with 501, must be accredited investors. On that basis, these accredited investors, who make the affirmative representation to prudential, that they know and understand the risks, are held to a standard of appreciating the risks that prudential has put in the offering documents. And they are numerous. As Judge Wilson points out in his order, and as we put in all of our documentation, the offering memoranda and the private placement memoranda are littered with the disclosures that are specific to this investment. Could you explain precisely how the Class E tranche or group of security holders lost all of their investment? In other words, how did it come about that their, it seems to me that if there are, their security, we have collateral for the notes, and in order for there to be default on their notes, they somehow have to be called in, and then it has to be attributed to this class, but the other class has still had some equity left? It's just not explained any way that I understand it. It may have been that some of the other classes would have had equity left, but the entire pool of bonds that were put into the investment in the beginning, in September of 1999, the structure of the portfolio, which, by the way, was done by FMA, not done by prudential, they choose bonds. They choose high-yield debt securities in the hopes that they're going to be able to provide the investors with a tremendous rate of return, and that the A tranche is going to be able to be paid their interest and their principal. The manager of that pool, FMA, leverages that pool of bonds in hopes to increase the rate of return on the portfolios. However, because of the marketplace in 2000, in 2001 and 2002, many of those bonds, because they were high-yield bonds, they were secured by other obligations of those issuers, and the marketplace, all of these are the disclosures that we've put in the OM and the PPM, defaulted. So, therefore, the bonds didn't have the value that they may have had when they were put into the portfolio in September of 1999. FMA, then, if the bond portfolio does not meet these certain liquidity tests, must attempt to sell some of the bonds in the portfolio. Sometimes they can't sell the bonds because the market has just fallen apart. We saw that with the technology sector in March of 2000. If they are able to sell some of the bonds, then it's possible that they can't go back into the marketplace and buy bonds that have a high enough yield in order to substantiate the portfolio. These are all things that were discussed and disclosed in the offering memoranda as being potential risks of this investment. Because the bond market fell apart and because the technology market fell apart, FMA was not able to replace the portfolio with sufficient bonds that were giving a high enough yield to pay off the A, B, C, et cetera, those other tranches. And as set forth in the documents, E, being the unrated and the lowest tranche, was number one in hopes of getting the highest rate of return after everybody else was paid off, was left with no collateral left in order to meet payouts to the other classes of the bonds, and, therefore, the investment failed. But these were all the types of disclosures that were made, especially for the E rated, excuse me, the E class. They were indicated that there was no recourse. If they couldn't pay the other bond holders with the collateral in the portfolio, there was no recourse for anybody else to pay the subsequent note holders. The liquidity factor was also discussed in great detail. The problems of the specific sectors of the specific industries that were in the portfolio are discussed in those disclosure documents, so that an investor that looked at the offering memoranda would know and appreciate all the various risks that were inherent in the CBO2 portfolio and specifically in the E notes. But the E notes were the ones that everybody was hoping would be the most successful because everyone else would be paid off and what else was left would go to the E notes. So you can appreciate that if the market worked in their favor, they would be the ones that would benefit the most, but they carried the biggest risk as well. And those are the things that we did disclose, which makes the omissions that Mr. Citrick suggests not material, because in the totality of the mix of everything that was disclosed in those offering documents, the two items that he did not, that he wanted in the mix were not relevant as compared to all these other disclosures that we suggested that we make. We think that the Trump case is very important in this instance, and one of the most important things that the Donald Trump case teaches us is that you cannot edit to win. Mr. Citrick cannot go back and try to edit our offering memoranda that we made in September of 1999 in an effort to win his case. It's just not right and it's not fair. Mr. Citrick has not been able to show that these two alleged omissions were indeed material when you look at the totality of the mix of the information. And no discovery, no discovery is going to change that. What was in those documents is what was there in September of 1999. We suggest that any amendment is futile and we suggest that any discovery isn't going to change the fact that what we did put in those documents provides the investor with the information that they need in order to make that investment decision on their own. We also suggest that the Statutes of Limitations all run in September of 1999 at the time that Mr. Citrick knew or should have known the relevant salient features of this investment. He chose to bury his head in the sand. He chose to rely on Mr. Rosen who said it's a mere boilerplate when, in fact, it is not a boilerplate document. All the disclosures are there. He chose not to read them. He did that at his own peril and his own risk. And Prudential met all of its obligations and its duties under these Securities Acts, provided the investors with all of the relevant salient information that they needed in order to make an investment decision. Thank you. Thank you very much. You have 30 seconds or so. Thank you. On the reliance point, Your Honor is correct. The district court improperly and erroneously rejected the declaration. We now have an alternative explanation. What about that? That being, Your Honor? The legal explanation that counsel gave about why the reliance on the attorney doesn't matter. Well, first of all, there are two problems with that. One, the cases to which counsel referred are cases only in which the person wasn't an agent.
judges: Berzon, Ikuta, Singleton